THAMES & MERSEY MARINE INS. CO., Limited, v. PACIFIC
CREOSOTING CO.

(Circuit Court of Appeals, Ninth Circuit.   May 10, 1915.)

No. 2459.

1. INSURANCE ☞146—CONSTRUCTION OF POLICY—EXCEPTIONS TO LIABILITY.

A stipulation in an insurance policy which is in the nature of an exception to the liability of the insurer must be construed strictly against it, and words of exception in a policy, if doubtful, are to be construed most strongly against the party for whose benefit they are intended.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 292, 294-298; Dec. Dig. ☞146.]

2. INSURANCE ☞478—CONSTRUCTION OF MARINE POLICY—VESSEL "ON FIRE."

In an exception in a marine policy on cargo warranting free from particular average "unless the vessel * * * be stranded, sunk or on fire," the words "on fire" are not to be construed as meaning the same as "burnt" which was formerly used in their place, but as having reference to a present state or condition regardless of any definite fixed result, and the effect of their use is to open the warranty if some structural part of the vessel was actually on fire, without regard to its extent.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1230-1238; Dec. Dig. ☞478.

For other definitions, see Words and Phrases, Second Series, On Fire.]

3. INSURANCE ☞478—EXCEPTION IN MARINE POLICY—VESSEL ON FIRE.

While a ship was lying in harbor for the discharge of cargo, fire was discovered in the after between-decks, which was still full of cargo. In response to an alarm crews of neighboring vessels came to her assistance, as well as employés of the consignee from shore, who brought chemical fire extinguishers, and, after working from half an hour to an hour, the fire was extinguished. A bulkhead, which was a part of the vessel, was blistered and blackened as was the deck above, and a door in the bulkhead was deeply charred over a considerable portion of its surface. A policy of insurance on the cargo warranted free from average unless general or the ship "be stranded, sunk or burnt," but a rider attached warranted "free from particular average unless the vessel or craft or the interest insured be stranded, sunk or on fire." Held, that the substitution of such provision for that in the body of the policy evidenced an intention to change the nature of the perils insured against, and that within its meaning the ship was on fire to such an extent as to open the warranty.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1230-1238; Dec. Dig. ☞478.]

4. INSURANCE ☞402—MARINE INSURANCE—RISKS INSURED AGAINST.

Under a cargo policy covering "all risks of craft and boats," and "all risks of transshipment and of craft, lighterage, and for any other conveyance from the warehouse until on board the vessel and from the vessel until safely delivered into warehouse," the insurer is liable for a loss sustained by the capsizing of a lighter used in discharging the cargo, in the absence of fault or negligence on the part of the insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1088-1090, 1093, 1103-1105; Dec. Dig. ☞402.]

5. INSURANCE ☞646—ACTION ON MARINE POLICY—DEFENSES—BURDEN OF PROOF.

The burden of proving that a loss of insured cargo by the capsizing of a lighter on which it was loaded was due to unseaworthiness of the lighter rests upon the insured, who relies upon it as a defense.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1645-1668; Dec. Dig. ☞646.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. INSURANCE ☜273—MARINE INSURANCE—RISKS INSURED AGAINST.

    Under a policy insuring cargo "against all perils, losses and misfortune that have or shall come to the hurt, detriment and damage of the aforesaid subject-matter of this insurance or any part thereof," there is no implied warranty by the insured of the seaworthiness of a lighter used in discharging the cargo at the end of the voyage.

    [Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 583–588; Dec. Dig. ☜273.]

7. INSURANCE ☜478—MARINE INSURANCE—CONSTRUCTION OF POLICY.

    Under the English law, which determines the liability under an English contract of insurance, where a marine policy on cargo contains a warranty "free from particular average unless the vessel * * * be stranded, sunk or on fire," where the vessel is stranded, sunk, or on fire during the adventure, the insurer is liable for a loss to the cargo, although it does not result therefrom.

    [Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1230–1238; Dec. Dig. ☜478.]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by the Pacific Creosoting Company against the Thames & Mersey Marine Insurance Company, Limited. Decree for libelant, and respondent appeals. Affirmed.

For opinion below, see 210 Fed. 958.

    This is a libel in personam filed by the Pacific Creosoting Company, a corporation of the state of Washington, against the Thames & Mersey Marine Insurance Company, Limited, a corporation of Great Britain, to recover the sum of $1,197.20 as insurance alleged to be due and owing to the Creosoting Company from the Insurance Company under a policy of Marine insurance issued by the latter on a cargo of creosote in drums shipped from London, England, to the Creosoting Company, at Eagle Harbor, Seattle, Wash., upon the British bark Sardhana. The policy of insurance was as follows:

    "Whereas, W. R. Lyon Lohr & Co. and/or as agents have represented to the Thames & Mersey Marine Insurance Company, Limited, that they are interested in or duly authorized as owner, agent or otherwise to make the insurance hereinafter mentioned and described with the said company and have promised or otherwise obligated themselves to pay forthwith for the use of the said company at the office of the said company the sum of forty-four pounds eighteen shillings and ten pence, as a premium or consideration at and after the rate of ninety shillings per cent for such insurance:

    "Now this policy of insurance witnesseth, that in consideration of the premises and of the said sum of forty-four pounds eighteen shillings and ten pence the said company promises and agrees with the said company, their executors, administrators and assigns that the said company will pay and make good all such losses and damages hereinafter expressed as may happen to the subject-matter of this policy and may attach to this policy in respect of the sum of nine hundred and thirty-two pounds hereby insured which insurance is hereby declared to be upon creosote in drums including packages and freight advanced valued at seven thousand four hundred and fifty pounds in the ship or vessel called the Sardhana whereof ―――― is at present master or whoever shall go for master of the said ship or vessel, lost or not lost, at and from London to Eagle Harbor, Puget Sound, or held covered at a premium to be arranged.

    "Including the risk of craft and/or raft to and from the vessel.

    "Warranted free from capture, seizure and detention and the consequences thereof, or any attempt thereat, piracy excepted, and also from all consequences of hostilities or warlike operations, whether before or after declaration of war.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"And the said company promises and agrees that the insurance aforesaid shall commence upon the freight and goods or merchandise aforesaid from the loading of the said goods or merchandise on board the said ship or vessel at as above and continue until the said goods or merchandise be discharged and safely landed at as above.

"And that it shall be lawful for the said ship or vessel to proceed and sail to and touch and stay at any ports or places whatsoever in the course of her said voyage for all necessary purposes without prejudice to this insurance.

"And touching the adventures and perils which the capital stock and funds of the said company are made liable unto or are intended to be made liable unto by this insurance they are of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and people of what nation, condition or quality soever, barratry of the master and mariners, and of all other perils losses and misfortunes that have or shall come to the hurt, detriment or damage of the aforesaid subject-matter of this insurance or any part thereof. And in case of any loss or misfortune it shall be lawful to the insured, their factors, servants and assigns to sue labor and travel for, in and about the defense, safeguard and recovery of the aforesaid subject-matter of this insurance the charges whereof the said company will bear in proportion to the sum hereby insured. And it is expressly declared and agreed that no acts of the insurer or insured in recovering, saving or preserving the property insured, shall be considered as a waiver or acceptance of abandonment. And it is declared and agreed that corn, fish, salt, fruit, flour and seed are warranted free from average unless general or the ship be stranded, sunk or burnt, and that sugar, tobacco, hemp, flax, hides and skins are warranted free from average under five pounds per centum unless general or the ship be stranded sunk or burnt; and that all other goods also freight are warranted free from average under three pounds per centum unless general or the ship be stranded sunk or burnt."

To the margin of the policy the Insurance Company had attached a printed slip containing additional clauses respecting its liability for a partial loss as follows:

"Warranted free from particular average, unless the vessel or craft or the interest insured be stranded, sunk or on fire, or in collision with ice or any substance other than water, (floating or nonfloating), the collision to be of such a nature as may reasonably be supposed to have caused or lead to damage of cargo, or vessel put into a port of refuge or distress and discharge part or whole cargo, each craft or lighter to be deemed a separate insurance, but to pay warehousing, forwarding and special charges if incurred, as well as partial loss arising from transshipment.

"General average and salvage charges payable according to foreign statement or York-Antwerp rules, or 1890 rules, if in accordance with the contract of affreightment. Including all risks of craft and boats. Including negligence and all liberties as per bill of lading and/or charter party.

"Including all risks of transshipment and of craft, lighterage and/or any other conveyances, from the warehouse until on board the vessel, and from the vessel until safely delivered into warehouse, or destination in the interior, or of fire while awaiting shipment.

"In case of deviation, change of voyage, or additional risk not specified, to be held covered upon terms to be arranged."

The Sardhana left the Thames on May 30, 1908, with 2,753 drums of creosote in good order and condition consigned to the Pacific Creosoting Company at Eagle Harbor, Seattle, Wash. It appears from extracts from the log, which were introduced in evidence, that on June 6th a sounding was made, and it was discovered that the sounding rod was slightly colored with creosote; that on June 11th the crew were employed placing extra chocks among the cargo; that from July 16th to September 14th the vessel experienced a succession of heavy gales, during which it rolled and pitched and strained and labored heavily; that the sea ran high, and the vessel shipped heavy seas on deck; that numerous sails were blown away; that on July 29th it was noticed that the cargo in the hold had commenced to

work, and it became necessary for the crew to enter the hold and secure it; that on July 30th the cargo again began to work, and that it continued to work from that date until August 4th, on which date the weather moderated a little and an old spanker boom was cut and used to chock off the cargo; that from that date until August 7th the crew were employed securing the cargo; that on August 25th it was discovered that the cargo was again loose in the hold and it remained loose until September 4th, when it was found that the drums were adrift and were rolling about in all directions; that it was impossible to secure the cargo at that time, and the cargo was not secured until September 14th, when the weather moderated; that on September 26th it was noticed by soundings in the pump well that there was an increase of liquid, which appeared to be mostly creosote; that on November 2d another strong gale was encountered, accompanied by a high sea, which continued during that day and the following day, during which the ship labored heavily and shipped much water on deck, and the cargo again worked badly.

The vessel arrived at Eagle Harbor, Seattle, on November 9, 1908. On November 17, 1908, the work of discharging the cargo was commenced, and was continued during that day and the following day, November 18, 1908; the unloading of the vessel being effected by means of a barge or lighter owned by the Pacific Barge Company, the drums being unloaded at the side of the vessel onto the barge or lighter and transported thence across the harbor to the wharf of the Creosoting Company. On November 18, 1908, fire broke out aboard the vessel. The entry in the log pertaining to the fire was as follows: "About 9:30 p. m. smoke was discovered issuing from the after hatch, by one of the crew, who immediately notified the master and then gave the alarm. This alarm was responded to by the crews of the ship Jupiter, the steamship Hornelen, and the employés of the Pacific Creosoting Company, who brought with them several fire extinguishers. The master went below through the lazarette and saw the reflection of the fire over the top of the bulkhead between the after 'tween-decks and the lazarette. The after 'tween-decks were still full of cargo. After considerable trouble the fire was extinguished, and it was then discovered that the aforesaid bulkhead together with the door thereof (the bulkhead was built in the vessel) and the dunnage in the after 'tween-decks were burned, and some of the ship's stores in the lazarette were damaged by water and chemicals. The origin of the fire was not discovered."

During the progress of the unloading of the vessel, and on November 21, 1908, 272 drums of creosote were discharged from the ship onto the lighter, and, evening having fallen, the lighter with the creosote was left moored to the side of the vessel, the intent being to convey the lighter and the drums to the wharf of the Creosoting Company on the following morning. During the night the lighter capsized, and the creosote was precipitated to the bottom of the harbor. It appeared from a survey made by Mr. Frank Walker, marine surveyor, and also from the testimony in the case, that the capsizing of the lighter was caused by a heavy gale which sprang up during the night. Subsequently 253 drums, undamaged, were recovered by divers, and 15 empty drums, that came to the surface, were recovered by a launch and crew of the creosoting works. The remaining four drums lost from the lighter were never recovered.

The unloading of the entire cargo from the vessel was surveyed by Walker, the marine surveyor. His survey showed that of the 2,753 drums of creosote consigned to the Creosoting Company 2,012 drums (which included the four drums lost from the lighter) were discharged full and in good order, 716 drums were discharged partially empty and in a damaged condition, and 25 drums were discharged in a damaged condition and entirely empty. Subsequently the creosote found in the partially filled drums, together with about 4,000 gallons which were pumped from the ship's limbers, was emptied into tanks of the Creosoting Company and measured, and it was thereby ascertained that the total loss of creosote (including the loss from the 25 drums which were found damaged and entirely empty, and the four drums lost from the lighter) was 56,267.2 gallons. The libel filed in the court below was for the recovery from the Insurance Company, under a general average adjustment, of its proportion of the value of the creosote not delivered, and of the 741 damaged drums (the drums having a distinct market value separate and apart from the creosote),

and of its proportion of the "sue and labor" expenses incurred by the Creosoting Company in recovering and salving the drums lost from the lighter, the total amount claimed to be due from the Insurance Company being $1,197.20. Judgment was entered in the court below in favor of the Creosoting Company for that amount, together with interest, from which judgment the Insurance Company has appealed to this court.

E. B. McClanahan and S. H. Derby, both of San Francisco, Cal., and Brady & Rummens, of Seattle, Wash., for appellant.

W. H. Bogle, Carroll B. Graves, F. T. Merritt, and Lawrence Bogle, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). 1. The policy of insurance upon which the present suit is based is embodied in a printed form, containing blanks which have been filled in by the Insurance Company with words and clauses appropriate and necessary to cover the risks assumed. At the end of the policy and as a part of such printed form there is the following clause:

"It is declared and agreed that corn, fish, salt, fruit, flour and seed are warranted free from average unless general or the ship be stranded, sunk or burnt, and that sugar, tobacco, hemp, flax, hides and skins are warranted free from average under five pounds per centum unless general or the ship be stranded, sunk or burnt; and that all other goods, also freight, are warranted free from average under three pounds per centum unless general or the ship be stranded, sunk, or burnt."

This clause is plainly inapplicable to the risk provided in the present policy, and is superseded by the following clause contained in certain conditions attached as a slip or rider to the margin of the policy:

"Warranted free from particular average, unless the vessel or craft or the interest insured, be stranded, sunk or on fire."

The warranty contained in the body of the printed form of the policy becomes therefore immaterial in the determination of the questions arising on this appeal, except in so far as its phraseology may throw some light upon the true interpretation and construction to be accorded to the special warranty contained in the attached slip above set forth. The warranty is what is known among insurance brokers as an "F. P. A." (free from particular average), or, a "particular average" warranty. In the absence of such a warranty a policy of insurance such as that involved in this case would be a particular average policy, and would cover both total and partial loss of cargo. The "F. P. A." warranty, however, overrides and controls the other terms of the policy, and changes the protection of the policy. By its provisions only a total loss of cargo is insured against, unless one of the excepted events therein enumerated, stranding, sinking, or being on fire, should come to pass. Upon the happening of one of the excepted events the warranty is then deleated, blotted out, or canceled, and the policy is to be construed as if it had never attached, and the insured thereupon becomes entitled to recover from the Insurance Company for any partial loss of cargo suffered by it. In the present case the loss sustained by the libelant was a partial loss. If, therefore, the Sardhana can be said to have been "on fire" within the meaning of that term as

used in the policy, the libelant is entitled to recover the amount due from the Insurance Company by reason of such partial loss; if the vessel was not "on fire" then the Insurance Company is not liable. The history of the warranty is set forth by Gow in his work on Marine Insurance (3d Ed.). It appears therefrom that the clause, as originally worded, read as follows:

"Warranted free from average, unless general, or the ship be stranded."

But later it was found necessary to permit the occurrence of other casualties, besides stranding, to annul the exception, and (the English courts having held that "average, unless general" was equivalent to "free of particular average") the clause consequently took the form, "warranted free from particular average unless the ship be stranded, sunk or burnt." The clause remained in that condition until 1893, when it came under the consideration of the English courts for the first time in the case of The Glenlivet, 68 L. T. Rep. N. S. 860, 69 L. T. Rep. 706. In that case fires had broken out in the coal bunkers of the vessel on different occasions and some damage was done to the structure of the vessel—a plate was cracked and some angle irons were burnt—and the question before the court was whether the ship had been "burnt" within the meaning of the word as used in a particular average warranty in a policy of marine insurance. The court held that the ship was not "burnt," and the rule was there laid down that a ship is not "burnt" within the meaning of the warranty unless the injury by fire be of so substantial a character that the ship as a whole can be said to be "burnt" in the popular sense of the term. Gow, in his work on Marine Insurance (page 179), referring to the word "burnt" as used in a particular average clause, and commenting upon the above decision, says:

"It is the ship that must be burnt, say a beam scorched, a floor charred, a ceiling burnt. Consequently the destruction of a cabin by fire removes the exception, while a fire in the cargo itself does not. Such was the view acted upon almost universally until quite lately. But a recent decision of Mr. Justice Barnes [the Glenlivet, 1893] has raised a new point. Fire occurred thrice, once on each of three separate and distinct voyages, in the Glenlivet's coal bunkers, but did not pass beyond them. As it was decided by Lord Ellenborough that a mere touching of the ground was not sufficient to make a stranding, so it is now decided in the Glenlivet Case that a mere burning is not sufficient to take the exception out of the memorandum; it must be such a burning as to constitute a substantial burning of the ship as a whole. The judgment in the Glenlivet Case has excited considerable attention, as it takes away on principle what was long granted without question. But indeed it is not easy to see why a fire in a ship's bunkers or cabin should be enough to establish a claim for damage to cargo arising from some other peril barred by the memorandum, when a touch and go graze on a rock, even if actually causing damage is not enough. Since the issue of the decision some ships have had the words 'on fire' added to 'burnt,' confessedly in the hope and expectation of thus restoring to the assured what has been taken from him by the decision."

And this is the condition in which we find the warranty in the present case, with the exception that the word "burnt" has been entirely left out, and the words "on fire" substituted therefor. The clause thus worded has never been construed by the courts of either the United States or Great Britain; and in our determination of the question we

must be guided by the history of the clause as above set forth, and such additional light as has been thrown upon the subject by the testimony of the witnesses in the case.

[1] It is a fundamental rule in the law of insurance that a stipulation in a policy which is in the nature of an exception to the liability of the insurer must be construed strictly against it, and that words of exception in a policy, if doubtful, are to be construed most strongly against the party for whose benefit they were intended. Canton Ins. Office v. Woodside, 90 Fed. 301, 33 C. C. A. 63. If the company by the use of an expression found in a policy leaves it a matter of doubt as to the true construction to be given the language, the court should lean against the construction which would limit the liability of the company. London Assurance v. Companhia de Moagens, 167 U. S. 149, 17 Sup. Ct. 785, 42 L. Ed. 113; National Bank v. Insurance Co., 95 U. S. 673, 24 L. Ed. 563. As said by Mr. Justice Harlan in the latter case:

"The company cannot justly complain of such a rule. Its attorneys, officers, or agents prepared the policy for the purpose, we shall assume, both of protecting the company against fraud, and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself."

[2] What, then, was the true intent and meaning of the words "on fire" in the clause, "warranted free from particular average unless the vessel or craft, or the interest of the insured, be stranded, sunk or on fire?" The learned proctors for the Insurance Company contend that the expression is synonymous with the word "burnt" as used in the policies prior to the decision in the Glenlivet Case, and must be construed even as the word "burnt" was construed in that case. If that construction be the true one, it follows that a ship cannot be deemed to be "on fire" within the meaning of the warranty unless the injury by fire is of so substantial a character that the ship as a whole can be held to be "on fire" in the popular sense of the term. In this construction we are unable to concur. But we do agree with the learned proctors for the Insurance Company that the words must be construed in the light of their popular meaning. That popular meaning is vastly different from the popular meaning of the word "burnt." In a strict, technical sense, perhaps, the words are closely allied. Generally speaking, it would be impossible to conceive of an object being "burnt" which had not also been "on fire," although the Court of Appeals in the Glenlivet Case refers to angle irons as being "burnt," despite the fact that the angle irons could not have been on fire. And vice versa, no object could, in the nature of things, ever be said to have been on fire without also being burnt. All this, we say, in a strict, technical sense; but the term is not to be interpreted by any such method. In a general and popular sense the two expressions convey very different ideas to the mind. The word "burnt" creates in the mind the idea of a definite, accomplished condition, a completed result. The words "on fire" convey rather the idea of a present state or condition, regardless of any definite, fixed result. And this natural meaning, rather than any strained

effect, must be the meaning attributed to the words in the present policy of insurance, and must be deemed to have been the construction placed upon them by the parties to the contract of insurance. Thus construed, it seems entirely plain to us that the Sardhana might well have been on fire, although the injury therefrom might not have been of so substantial a character that the ship as a whole could have been said to be either "burnt" or "on fire." In the determination of the question we are, of course, confronted with the same difficulty which beset the English Court of Appeals, and we concur with that court that each case must be decided according to the actual facts appertaining to each particular case.

[3] In the present case, there is the usual conflict of testimony, respecting not only the extent of the damage caused by the fire, but also in the circumstances surrounding it. It is, however, not denied that a large door, called a bulkhead door, which constituted a part of the bulkhead, was on fire and was burned. This door separated the lazarette from the 'tween-decks. The door was of wood, about 6 feet high, 4½ feet wide, and 1 inch thick. It has been brought to this court, and an examination shows it to be deeply charred over a considerable portion of its surface, the remainder of the surface being blackened and blistered by the smoke and flames. · It is also admitted that the paintwork on the bulkhead proper in the vicinity of the door was blackened and blistered, as was also the deck or ceiling above. There is conflict in the testimony as to whether the bulkhead proper was actually on fire or burned, but we think this conflict, as well as the conflict with respect to the difficulty experienced in putting the fire out, is definitely settled by the entry in the log, made immediately after the fire by the master of the vessel. That entry was as follows:

"About 9:30 p. m. smoke was discovered issuing from the after hatch by one of the crew, who immediately notified the master and then gave the alarm. This alarm was responded to by the crews of the ship Jupiter, the steamship Hornelen and the employés of the Pacific Creosoting Company, who brought with them several chemical fire extinguishers. The master went below through the lazarette and saw the reflection of the fire over the top of the bulkhead between the after 'tween-decks and the lazarette. The after 'tween-decks were still full of cargo. After considerable trouble the fire was extinguished, and it was then discovered that the aforesaid bulkhead, together with the door thereof [the bulkhead was built in the vessel] and the dunnage in the after 'tween-decks were burned, and some of the ship's stores in the lazarette were damaged by water and chemicals. The origin of the fire was not discovered."

This entry is supported by testimony in the case to the effect that the fire appeared to be quite stubborn, and a great deal of difficulty was experienced in putting it out, and that the time which elapsed from the time the alarm was given until the fire was out was from one-half to one hour. It is not denied that assistance was rendered by crews of neighboring vessels, and that chemical fire extinguishers furnished by the libelant were used in putting out the fire.

We are of opinion that the testimony of the witnesses, together with the exhibit above referred to, show beyond dispute that the Sardhana was "on fire" within the meaning of the term as used in the warranty. This determination finds support in the comment of Gow above set

forth, to the effect that the words were inserted after the decision in the Glenlivet Case for the purpose of restoring to the assured what was taken from him by that decision, and also in the testimony of A. M. Beckett, an average adjuster of many years' experience in England and in America, who was called as a witness for the libelant. He testified that after the decision in the Glenlivet Case the insurance companies immediately changed their policies because the assured wanted better protection; that it was the practice of adjusters in England to consider a warranty such as the one in the policy of insurance in this case, open, if some structural part of the vessel was actually on fire; that it depended on the fact that the structure was on fire, but not the extent of the fire; that such construction of the warranty had never been contested by the marine insurance underwriters as far as he knew; that under the practice of the English adjusters he would consider that the burning of the door which was built into the bulkhead in the Sardhana would be a burning of the structure of the vessel, and would open the warranty.

In connection with the testimony of the witness Beckett there must also be noted the change of terms in the policy involved in this case. In the body of the policy, and constituting a part of the printed form thereof, corn, fish, salt, fruit, flour, and seed were warranted free from average, unless general, or the ship be "stranded, sunk or burnt," sugar, tobacco, hemp, flax, hides, and skins were warranted free from average under five pounds per centum, unless general, or the ship be "stranded, sunk or burnt," and all other goods, including freight, were warranted free from average under three pounds per centum, unless general, or the ship be "stranded, sunk or burnt." The fact that in the special warranty the term "on fire" was substituted for the word "burnt" conclusively shows, in our judgment, a deliberate intent on the part of the Insurance Company to change the nature of the perils assured against and to increase the risk assumed by it under the policy.

The conclusion at which we have arrived is based mainly upon the facts as they appear in the present case, and we must not be understood as laying down a rule which would be applicable to all cases which might arise under similar warranties. Each case, as we have stated, must be determined with reference to its own particular facts. The Supreme Court of the United States in construing the word "collision" in a policy of marine insurance laid down a similar rule in the case of London Assurance v. Companhia de Moagens, supra, and the English courts have consistently left to be determined by the facts of each case the vexing questions relating to the word "stranded" in warranties similar to the one now under consideration.

[4] 2. The next question relates to the right of the libelant to recover the value of the four drums lost from the barge when it capsized during the night of November 21, 1908, and also the "sue and labor" expenses incident to salvaging the drums which were recovered from the waters of the harbor. It is not denied by the Insurance Company that the expenses incurred in recovering the creosote lost from the barge were proper expenses, and that the same were paid by the Creosoting Company. In the body of the policy it is provided:

"And the said company promises and agrees that the insurance aforesaid shall commence upon the freight and goods or merchandise aforesaid from the loading of the said goods or merchandise on board the said ship or vessel at as above, and continue until the said goods or merchandise be discharged and safely landed as above."

Then after enumerating certain perils insured against it was provided:

"And of all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the aforesaid subject-matter of this insurance or any part thereof."

Turning again to the special warranty contained in the slip attached to the policy of insurance, we find that the insurance there provided covers "all risks of craft and boats," and also—

"all risks of transshipment and of craft, lighterage and/or any other conveyances, from the warehouse until on board the vessel and from the vessel until safely delivered into warehouse."

The liability of the Insurance Company for the loss sustained by the capsizing of the lighter or barge on which the creosote had been loaded preparatory to being conveyed from the vessel and delivered into the warehouse could hardly be expressed in plainer language, and these clauses must be deemed to be decisive of the question. The contention of the Insurance Company that under the contract of affreightment it was incumbent upon the libelant to furnish a lighter in all respects seaworthy, and that duty was not performed by it, does not, for many reasons, appear to be available to the Insurance Company as a defense to the loss here claimed by the libelant. The contract of affreightment is not in the record, and we do not know what the provisions of that contract were. Nor do we know that the libelant furnished the lighters for the landing of the cargo, or was required so to do. The only evidence upon the subject is that of Capt. David Baird, who was called as a witness on behalf of the Insurance Company. He testified that he was the marine surveyor or superintendent at Seattle for the owners of the vessel; that part of his duty was to see the vessel discharged; that he didn't know who furnished the scows, and was unable to state what the conditions of the charter were. In answer to the direct leading question whether the ship was freed from liability after the cargo left her tackle he answered in the affirmative, and when asked how he knew that he replied it was in the charter party, "that it was the usual clause in every case," but when asked if he knew it was in this charter party he said he "would not swear at present that it was." Capt. Alexander Wallace, the master of the vessel, whose deposition was taken by the Insurance Company, testified that the cargo was discharged by stevedores under his supervision, but he was not asked and did not state who furnished the lighters for conveying the cargo to the warehouse. How can it be said upon this testimony that it was incumbent upon the libelant to furnish a lighter in all respects seaworthy? But assuming that it did furnish the lighter, what evidence is there that it was unseaworthy? The presumption of law is that every vessel is seaworthy until the contrary is proven.

[5] The burden of proving that a vessel is unseaworthy lies upon the Insurance Company. Gow on Marine Insurance, page 273; Nome

Beach Lighterage, etc., Co. v. Munich Assur. Co. (C. C.) 123 Fed. 820, 827, and cases there cited. That burden has not been sustained by the latter company. No one witnessed the capsizing of the barge; but it appears that on the night in question there was a gale blowing, and, although the Sardhana and the barge were not exposed to the fury of the storm, nevertheless there was a heavy swell in the section of the harbor in which the vessel, with the barge moored to its side, was anchored. The Insurance Company claims that the barge could not have capsized unless it was in a leaking condition by which water was permitted to enter the hold. But the barge was placed in dry dock shortly after the accident, and a survey thereof revealed that the timbers were sound and the barge did not leak. But suppose the lighter was unseaworthy, how would that fact relieve the Insurance Company from liability unless with respect thereto there was some neglect or misconduct on the part of the libelant which was not alleged in the answer and has not been proven? We look in vain through the insurance policy to find any warranty on the part of the libelant that either the vessel or the lighter employed to deliver the cargo into the warehouse was seaworthy. Now, while there is an implied warranty on the part of the owner of cargo that the vessel is seaworthy at the commencement of the voyage, there is no such implied warranty with respect to a lighter employed to transport the cargo from the vessel to the warehouse at the end of the voyage. 2 Arnould Marine Ins. § 689; Lane v. Nixon, 1866, L. R. 1 C. P. 412.

[6] The case of The Galileo (Aspinall's Mar. Law Cas. advance sheets, vol. 12, pt. 6, page 461; s. c., in House of Lords, Law Rep. A. C. 1915, page 199), is cited by the Insurance Company as authority for the rule that an implied warranty of seaworthiness extends to all lighters used in the course of transshipment of a cargo, and this irrespective of whether the lighters are furnished by the shipper or not, and irrespective of whether the contract of shipment contain a clause that the carriage of goods in such lighter is to be "at the risk of the owner of the goods." The action in that case was by the shipper against the shipowner to recover damages for a breach of a contract of affreightment to carry and deliver certain articles of machinery from New York to Norrkoping, in Sweden. The bill of lading was a through bill of lading, providing that the goods were "to be delivered in like good order and condition at the port of Hull and to be thence transshipped at the ship's expense and the shipper's risk to the port of Norrkoping," and it was thereby mutually agreed that the carrier should have "liberty of conveying the goods in crafts and/or lighters to and from the steamer at the risk of the owners of the goods," and that he should not be liable "for risk of craft or transshipment." The freight was a through freight rate; but the goods were to be transshipped at Hull into another vessel belonging to the shipowner for carriage to Norrkoping. When the vessel reached Hull there was no steamer ready to immediately carry the goods to Norrkoping, and thereupon the defendants hired a lighter and placed the goods therein whilst waiting to be transshipped in another of the defendants' steamers for conveyance to Norrkoping. The light-

er was left unattended in a crowded harbor. Two or three nights after the goods went over the side of the vessel the lighter foundered. Part of its planking was rotten, and it was found upon examination that a hole had been punched in its side apparently by a boat hook from a neighboring lighter. The result was that plaintiff's machinery was damaged. The defendants had received the plaintiff's goods on board their vessel in New York in "apparent good order and condition." Under the terms of the through bill of lading they were obligated to deliver these goods at Norrkoping in "like good order and condition." The duty of transshipment at Hull rested upon the shipowner, and this duty was accompanied with the corresponding duty to care for the shipper's goods and avoid negligence. This they failed to do, and it was found as a fact that the defendant was negligent in making the transshipment of the goods at Hull. If there was an implied warranty that the lighter was seaworthy, it rested equally upon the shipper and the shipowner, but the primary and underlying contractual obligation rested upon the shipowner to care for the shipper's goods and deliver them in good order and condition at Norrkoping, and it was for the breach of this obligation that the shipowner was held liable. The decision does not, in our opinion, extend the law of implied warranty respecting the seaworthiness of lighters at the end of a voyage, and manifestly it has no bearing upon the contractual obligation of an insurance company to indemnify the insured against "all perils, losses and misfortunes that have or shall come to the hurt, detriment and damage of the aforesaid subject-matter of this insurance or any part thereof."

[7] 3. Lastly, it is contended that the libelant cannot recover in any event: First, because it has not been shown that the creosote was lost; and, second, because the creosote, if lost, was not on board the vessel at the time of the fire, and hence the particular average warranty is not applicable. These claims are based on testimony tending to show that all of the creosote which leaked from the drums during the voyage remained in the bottom of the ship and was pumped out and delivered to the libelant at the time of discharge of the cargo. But the great preponderance of the evidence is against this testimony, and conclusively shows that all of the creosote shipped at London was not delivered to the libelant. The marine surveyor, Walker, so found in his survey. It is true about 4,000 gallons of creosote were pumped from the ship's limbers and delivered to the libelant; but it was found that with this addition there still remained a shortage of 56,267.2 gallons. With respect to this shortage, the marine surveyor testified that in the course of his investigations he was told by the mates of the Sardhana, and also by members of the crew thereof, that the creosote was pumped overboard while the vessel was at sea. But the Insurance Company contends that, conceding that the creosote was pumped overboard while the vessel was at sea, the libelant cannot recover for its loss because the creosote was not on board the vessel at the time of the fire, citing the cases of Thames & Mersey Marine Ins. Co. v. Pitts, Law Reports, Q. B. Div. (1893) vol. 2, p. 476, and The Alsace Lorraine, 69 L. T. Rep. page 261.

Neither of the cases cited are applicable to the facts of this case. In the former, the portion of the cargo for which recovery was sought had never been aboard the vessel, but was in a lighter awaiting the arrival of the vessel at the time the latter "stranded"; in the latter case, at the time the vessel "stranded" the whole of the cargo had been placed on shore at a port of refuge for the purpose of having the vessel repaired.

The policy of insurance in the present case is an English policy, and any controversy respecting its terms must, of course, be determined by the law of that country. London Assurance v. Companhia de Moagens, 167 U. S. 149, 162, 17 Sup. Ct. 785, 42 L. Ed. 113.

"The English courts have held, and do now hold, that the expression 'free of particular average unless the vessel be stranded', meant that if a loss occurred during the adventure, although from a cause not related in any way to the stranding of the ship, the insurers were liable upon the general language of the policy. * * * Although the original language of the memorandum confined the exception to a stranding of the ship, it was afterwards extended so as to read, 'free of particular average unless the vessel be sunk, burned, stranded or in collision.' The same rule applies to all, and if the vessel be either sunk, burned, stranded or in collision, it is sufficient to render the insurer liable, although the loss does not result therefrom." London Assurance v. Companhia de Moagens, supra.

The decree of the court below is affirmed.