FIREMAN'S FUND INS. CO. v. GLOBE NAV. CO. et al.

THE NOTTINGHAM.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1916.)

No. 2631.

1. INSURANCE ⬡➾646(6)—CAUSES OF LOSS—MARINE INSURANCE—UNSEAWORTHINESS—BURDEN OF PROOF.
As between owner and insurer, the burden of proving that a vessel is unseaworthy, rests upon the insurer.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1659–1662, 1664; Dec. Dig. ⬡➾646(6).]

2. INSURANCE ⬡➾665(4)—CAUSE OF LOSS—MARINE INSURANCE—PROOF OF UNSEAWORTHINESS.
Where, on an authorized survey of a vessel before commencing a voyage, she was reported seaworthy and in good condition for the intended voyage, evidence of a very clear and convincing character is required to overcome such proofs and establish that her loss during the voyage was due to her unseaworthiness at its commencement.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1722; Dec. Dig. ⬡➾665(4).]

3. INSURANCE ⬡➾388(3)—WAIVER OF FORFEITURE—MARINE INSURANCE.
It is a rule of the marine law of insurance that any forfeiture of a policy caused by a violation of its terms will be deemed waived by the insurer, if, after knowledge of the facts constituting such forfeiture, he treats the policy as obligatory.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1027; Dec. Dig. ⬡➾388(3).]

4. INSURANCE ⬡➾646(8)—CAUSE AND AMOUNT OF LOSS—BURDEN OF PROOF.
The burden of proving a loss, for a cause and to an amount for which the insurer is liable, is upon the insured.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1665; Dec. Dig. ⬡➾646(8).]

5. INSURANCE ⬡➾468—EXTENT OF LOSS—MARINE INSURANCE—ACTUAL TOTAL LOSS.
Where the hull and some parts of the apparel and equipment of a vessel, which became water-logged in a storm and was abandoned by her crew, were saved and brought into a port by salvors in a condition capable of being repaired at some cost, the vessel, as a vessel, was not destroyed, and there was not an actual total loss within the terms of an insurance policy.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1188–1191, 1246; Dec. Dig. ⬡➾468.]

6. INSURANCE ⬡➾149—CONSTRUCTION OF CONTRACT—INCONSISTENCY BETWEEN WRITTEN AND PRINTED PROVISIONS.
If there be any inconsistency between a written provision of a policy and the printed portions thereof, the written language must prevail.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 301–304; Dec. Dig. ⬡➾149.]

7. INSURANCE ⬡➾146(3)—CONSTRUCTION OF CONTRACT—AMBIGUOUS LANGUAGE.
If a policy will fairly admit of two constructions, the one should be adopted which will indemnify the insured.
[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 295; Dec. Dig. ⬡➾146(3).]

⬡➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. INSURANCE ⬤═150—MARINE INSURANCE—CONSTRUCTION OF CONTRACT.

A provision, written on the margin of a marine policy on a ship, that "This insurance is against total and/or constructive total loss of vessel, including general average and/or salvage charges, * * * *" construed, and *held* not inconsistent with or to abrogate a clause of the policy providing that "the insured shall not have the right to abandon the vessel unless the amount which this company would be liable to pay under an adjustment as of partial loss for labor and materials (exclusive of salvage or general average expenses and the cost of funds) shall exceed half the amount hereby insured."

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 305–307; Dec. Dig. ⬤═150.]

9. INSURANCE ⬤═469—MARINE INSURANCE—RIGHT OF ABANDONMENT.

An insured is not entitled, to abandon a vessel as for a constructive total loss, under the "high probability" rule, where the policies contain a provision fixing the right to abandon on certain specified terms.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1192–1227; Dec. Dig. ⬤═469.]

10. INSURANCE ⬤═469—MARINE INSURANCE—RIGHT OF ABANDONMENT.

The right of an insured to abandon a vessel as for a constructive total loss must be determined by the situation of the vessel and the conditions existing at the time notice of abandonment is given.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1192–1227; Dec. Dig. ⬤═469.]

11. WORDS AND PHRASES—"COLLISION CLAUSE"—"RUNNING DOWN CLAUSE."

An additional provision for insurance, on the margin of the policy, covering the contingency of a collision of the insured vessel with another vessel and the liability of the insured for the injury to such other vessel, is known as the "collision clause," or the "running down," clause.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Collision.]

Rudkin, District Judge, dissenting.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Libel in personam by the Globe Navigation Company, appellee herein, and S. P. Weston, its trustee in bankruptcy, against the Fireman's Fund Insurance Company, appellant, to recover the amounts of two policies of marine insurance issued by the latter on April 17, 1911, for $6,000 and $24,000, respectively, upon the schooner Wm. Nottingham, owned by appellee, and which it is alleged was totally lost by perils of the sea and perils insured against in said policies. Decree for libelant for $30,000, with interest and costs, less $8,500 deducted in accordance with agreement of the parties. The insurance relates to the same disaster stated in Fireman's Fund Insurance Co. v. Globe Navigation Co. and S. P. Weston, as Trustee in Bankruptcy, No. 2630, 234 Fed. 273, —— C. C. A. ——. Respondent appeals. Reversed.

The schooner Wm. Nottingham, with Capt. A. W. Swenson as master, sailed from Westport, Or., on September 26, 1911, laden with a cargo of lumber, bound on a voyage to the port of Callao, Peru. The vessel had been insured by the appellant company on April 17, 1911, for the period of one year, in two policies of insurance, one for $6,000, and the other for $24,000—total of $30,000. The vessel was valued at $45,000 in the policies. Her actual value was $30,000. On August 25, 1911, while the schooner was at Astoria, Or.,

she was surveyed for the appellant by one Albert Crowe, a marine surveyor, who certified that he had examined the vessel and found her in good condition and suitable for the intended voyage and cargo. The vessel was loaded at Westport, Or. On the afternoon of September 26th, in attempting to pass out of Westport slough into the Columbia river at high tide, the vessel grounded, and remained aground until high tide next day, when she was pulled off by two tugs. She then proceeded on her voyage down the Columbia river to Astoria, where she was again surveyed by one Cherry, who appears to have been acting for surveyor Crowe, whose name was attached to the report. The surveyor reported that he had "held a final survey on the vessel and found her well laden and the deck load thoroughly secured. Consider vessel in good trim for making the intended voyage." After this survey, the vessel proceeded to sea on October 2d.

The Columbia river bar was rough, but Capt. Swenson testified that in his opinion it was not rougher than was safe for crossing. The captain testified further: After crossing the bar the vessel stood offshore on a port tack. After everything had been straightened up on deck, the captain directed the mate to sound the pumps, which he did, and found 15 inches of water in the well. This was the normal amount of water to be in the vessel after she had been lying in port for a time without being pumped out. The captain did not feel uneasy. Four hours afterward he sent down to try the pumps again, and it took a little longer than usual to pump her out; but he testified that sometimes there is a lot of drain from different parts of the ship, which probably caused the water to drain through the wells, and the men might not have pumped as hard as others, so he did not feel uneasy. The vessel stood on the port tack to about 128° west, or until October 4th. It then took the men about an hour in every four before they could free the ship from water; but this fact did not cause the captain to feel uneasy, for the reason that they had quite a breeze blowing, about 35 miles an hour or so. But the wind shifted to the southwest and increased, and the captain was compelled to put the vessel on the starboard tack. As he was well offshore, he could stay on this tack down the coast. When the vessel was put on the starboard tack, the sea was pretty rough, and she took an unusually heavy lurch to port, and the deck load shifted about four inches. The vessel then commenced to make water freely. Upon examination it was found that water was coming into the storeroom at the break of the poop—what was called the half deck. The water was pouring in there on the port side. The captain went forward and found the galley was flooded, the water coming in somewhere through the shifting of the deck load. The sea at that time was rough—very rough. The vessel lay over considerably. Most of the water was on the lee or port side. The vessel lying over on the port side caused this part of the vessel to get under water. This was sufficient to take in the water found in the vessel. It was at this time the captain sent the men down, and they worked for four hours without being able to get her free of water. Then the captain ordered the mate to start the steam pump, and something happened to be wrong with it; the captain did not know what it was. It happens sometimes that a piece of wood or something gets into the valve and clappers and prevents the pump from doing its work. The steam pump was last used at Astoria before leaving. The pump was then apparently in good condition, but it was not then used for the purpose of pumping out the vessel. At that time an additional section of hose was placed on the pump and was let over the side and the valve leading down into the hold was closed. Apparently the pump was in good condition, pumping the water over the side of the ship for washing down the vessel. When the captain found that the hand pump did not handle the water and the steam pump failed to work, he tried to get to port; he was trying to run for Cape Flattery, but the sea was rough and windy. On October 8th the steam pump was working. Had southeast wind from October 2d to October 8th. On the afternoon of October 8th, and some time after the steam pump had got to work, the vessel was struck by a heavy gale from the northwest. It came so suddenly that it carried away one of the boats hanging in the davits and lashed with double lashing. It tore the boat from the lashing and threw it out on the water, and, although the vessel was on the right tack for the wind to strike the sails, she almost went on her beam

ends. The force of the wind at that time was 100 miles an hour. The captain tried to get the vessel before the wind, but she was slow in getting there. For some time she was throwing herself on her beam ends. After the first heavy wind she righted herself somewhat, but during that heavy lurch she shifted her deck load considerably, and then she did not answer her helm. She went over so much that the water came up in the donkey room and put out the fire, and they were unable to keep up steam. The captain then tried to get her on the other tack, so as to straighten her up and pump her out, but he was unable to do so; she did not answer her helm. The vessel continued to fill. Early on the morning of the 9th the situation was serious. The captain concluded to try and jettison the deck load and prepara-tions were made for that purpose, but before the preparations were com-pleted the vessel laid over so much that the deck lashings parted, the deck load took a slide to port and up against the rigging, carrying away three masts—the main, mizzen and spanker—and the masts and deck load even with the rail went over the side. The wreckage was held by the forespring stay. To get rid of the wreckage it was necessary to cut this forespring stay. Volunteers were called for, and one man came forward and cut away the stay, and that released the vessel of the wreckage. When this was done they started to pump her out, but found that the water was coming in through the holes in the side caused by the chain plates tearing out. They then rigged a raft and went over the sides and plugged up the holes. They set the fore-sail and forestaysail, and hand-rigged some of it on a jury mast which had been set up in the meantime. Then a heavy gale set in from the southeast. When the deck load went overboard, something forward caused the connections between the donkey boiler and the fresh water tanks to break, and all the fresh water was lost. The donkey engine was then operated on salt water, and the vessel was nearly pumped out when a second gale from the southeast struck her and the vessel commenced to fill. This was on October 11th. The sea commenced to run over the vessel. The force of the wind was then about 50 miles an hour. The vessel was put before the wind, and they tried to steer for Cape Flattery. Sighted two vessels, but they failed to respond to the distress signals. On October 13th the schooner David Evans hove in sight. The crew insisted upon abandoning the vessel. They had been without fresh water for four days. The vessel was thereupon abandoned by the officers and crew, and they were carried to Astoria, Or., on the schooner David Evans, where they arrived on October 14th.

The tug Wallula picked up the vessel after her abandonment by her officers and crew and brought her into the port of Astoria on October 15th. On Oc-tober 16th the manager of appellee, G. F. Thorndyke, served a written notice of abandonment of said vessel, and made claim for a total loss under policies of insurance, upon Frank G. Taylor, appellant's agent at Seattle, Wash. The abandonment was declined by appellant. Subsequently the vessel was libeled by the salvors for $34,000 salvage. There were no facilities at Astoria for repairing the vessel, nor could she be discharged, surveyed, or examined at that place. After the abandonment by the appellee, it was agreed by the appellant and appellee that the appellee should arrange to have the vessel taken up the Columbia river to St. Johns, near Portland, where she could be discharged and surveyed. The salvors would not surrender possession, nor take the boat to St. Johns, nor assume the expense nor the risk of towage from Astoria to St. Johns. The appellee thereupon, at the instance of appel-lant, applied to the United States District Court at Portland and obtained an order from that court in salvage proceedings permitting the towing of the vessel from Astoria to St. Johns and the discharging of the cargo, upon con-dition that the expense thereof should be paid by the appellee as against the salvors, and that the appellee would execute an indemnity bond to protect the salvors against the risks of the voyage. The bond was given by appellee, and the vessel was thereupon towed to St. Johns, the cargo discharged, and the vessel put in dry dock and surveyed. Subsequently representatives of the appellee arranged a settlement with the salvors upon the payment of $3,000 and for a release of the vessel from the custody of the marshal on account of the salvage claim and other expenses amounting in the aggregate to $8,433.52.

When the vessel had been surveyed, specifications for repairs were drawn up by representatives of the appellant and appellee, and bids invited from a number of firms on these specifications. These bids were as follows:

| | |
|---|---|
| Oregon Dry Dock Company | $25,200.00 |
| Vulcan Iron Works | 24,600.00 |
| St. Johns Ship Building Company | 23,070.75 |
| Albina Engine & Machine Works | 20,950.00 |

Thereupon the insurance adjusters made a statement of the expenses incurred subsequent to the written abandonment of October 16th by the appellee, apportioning the expenses that were for the joint benefit of the vessel and cargo between those interests, and charging to the owners the expenses that were for the benefit of the vessel alone. The joint expenses of vessel and cargo, including the $3,000 salvage award, amounted by this adjustment to $8,780.01. This was the general average charge for both the vessel and cargo. Of this amount the vessel paid $5,637.46 and the cargo $3,142.55. Appellant's proportion of the amount paid by the vessel, namely, $5,637.46, was the proportion which the amount insured, $30,000, bore to the value of the vessel declared in the policies, $45,000, making appellant's proportion the $30000/45000 part of $5,637.46, or $3,758.31. The additional expenses charged to the appellee alone, as found by the adjusters, amounted to $3,244.58. The appellant subsequently paid the appellee, through the adjusters, two-thirds of the vessel's proportion of the joint expenses of vessel and cargo as found by the adjusters, namely, $3,758.31.

Suit was brought on the policies on May 13, 1912, at Seattle, claiming a total loss. Appellant answered June 13, 1912, denying that the damages to the vessel amounted to total loss under the policies, but admitting its liability under the policies for its proportion of general average and salvage charges accruing from the preservation of the vessel and cargo. Subsequently, upon the completion of the average adjustment, it paid this proportion as a liability under the policies. On March 10, 1914, appellee filed an amended complaint, alleging a verbal abandonment of the vessel by the appellee to the appellant on October 14, 1911. On March 31, 1914, appellant filed an amended answer, denying the verbal abandonment of the vessel by the appellee on October 14, 1911, and setting up, for the first time, unseaworthiness as a defense to this action. The unseaworthiness of the vessel alleged in the answer consisted "in that she was leaky and her pumps were not in working order, so that the same could be used to keep said vessel free from water which entered her hull through said leaky condition, and that by reason thereof said vessel commenced to leak and became water-logged in fair weather immediately after starting upon said voyage; that all losses and damages suffered by said vessel upon said voyage were caused and occasioned by the aforesaid unseaworthiness of said vessel."

The policies in question were of the usual San Francisco hull time form, insurance against total loss, and containing the following provision: "But no partial loss or particular average shall in any event be paid under this policy. This company not to be liable for any sums the insured may pay to another vessel, her cargo or freight, for or on account of collision." There was, however, written upon the margin of each policy the following clause: "This insurance is against total and/or constructive total loss of vessel, including general average and/or salvage charges and/or claims under three-fourths (¾) running down clause."

Edward J. McCutchen, Ira A. Campbell, and McCutchen, Olney & Willard, all of San Francisco, Cal., and Ballinger, Battle, Hulbert & Shorts, of Seattle, Wash., for appellant.

H. R. Clise, C. K. Poe, W. H. Bogle, C. B. Graves, F. T. Merritt, and Lawrence Bogle, all of Seattle, Wash., for appellees.

Before GILBERT and MORROW, Circuit Judges, and RUDKIN, District Judge.

MORROW, Circuit Judge (after stating the facts as above). The appellant defends this action on the grounds: 1. The vessel was not seaworthy when she set out on the voyage in question. 2. The vessel did not become a total loss. 3. The vessel did not, under the terms of the policies, become a constructive total loss.

1. It is provided in the policies of insurance that:

"The adventures and perils which this insurance company is contented to bear, and takes upon itself, * * * are of the seas * * * and all other losses and misfortunes that shall come to the hurt or damage of the vessel, * * * or any part thereof, to which insurers are liable by the rules and customs of insurance in San Francisco, including * * * the provisions of the Civil Code of California, excepting such losses and misfortunes as are excluded by this policy."

Section 2682 of the Civil Code of California provides:

"A ship is seaworthy when reasonably fit to perform the services, and to encounter the ordinary perils of the voyage, contemplated by the parties to the policy."

Section 2683 of the Civil Code of California provides that:

"An implied warranty of seaworthiness is complied with if the ship be seaworthy at the time of the commencement of the risk, except in the following cases:

"1. When the insurance is made for a specified length of time, the implied warranty is not complied with, unless the ship be seaworthy at the commencement of every voyage she may undertake during that time. * * *"

The defense that the vessel was unseaworthy had reference, therefore, to her condition when she commenced her voyage at Westport on September 26, 1911, for Callao, Peru.

[1] The burden of proving that a vessel is unseaworthy lies upon the insurance company. The presumption of law is that every vessel is seaworthy until the contrary is proved. Gow on Marine Insurance, p. 273; Arnould on Marine Insurance, par. 725; Adderly v. American Mut. Ins. Co., Fed. Cas. No. 75; Bullard v. Roger Williams Insurance Co., Fed. Cas. No. 2122; Lunt v. Boston Marine Insurance Co. (C. C.) 6 Fed. 562; Moores v. Louisville Underwriters (C. C.) 14 Fed. 226; Guy v. Citizens' Mutual Insurance Co. (D. C.) 30 Fed. 695; Earnmoor v. California Insurance Co. (D. C.) 40 Fed. 847; Nome Beach Lighterage & Transp. Co. v. Munich Assur. Co. (C. C.) 123 Fed. 820, 824; Thames & Mersey M. Insurance Co. v. Pacific Creosoting Co., 223 Fed. 561, 570, 139 C. C. A. 101.

[2] In Arnould on Marine Insurance, par. 726, the author says:

"With regard to the means of proving that the ship was seaworthy or the reverse, the most satisfactory evidence is that of the persons who were employed to survey and examine the vessel."

Capt. Swenson, in his testimony taken in August, 1913, testified that he had two surveys made of the vessel. The first was made before the cargo was stowed, and the second after the vessel was loaded for her voyage. He produced these reports of surveys. The first was a report dated August 25, 1911, and the second was a report dated September 27, 1911. Both reports are signed by Albert Crowe, surveyor for the appellant; but the last report appears to have been actually made by one Cherry, Lloyd's agent at Astoria, for Mr. Crowe. The

first examination was made before the vessel was loaded, and certifies that the surveyor had "examined the vessel and found her in good condition and suitable for the intended voyage and cargo." The second examination was made after the vessel was loaded, and the report certifies that the surveyor had "held a final survey on this vessel and found her well loaded and the deck load thoroughly secured." The report further certifies:

"Consider vessel in good trim for making the intended voyage."

When these reports were offered in evidence, it was mentioned that Surveyor Crowe, who signed the reports, had since died. An objection was thereupon made to the reports, but withdrawn upon the suggestion of some further arrangement concerning this evidence. We do not find any further objection made to these reports, but they were admissible upon the testimony of the captain that he had had the surveys made and that these were the reports. Here was evidence of a very direct and positive character tending to prove that the vessel was seaworthy when she started on her intended voyage. To overcome this proof, evidence of a very clear and convincing character was required. Mere conjecture or suspicion that the vessel was not seaworthy was not sufficient.

In the original answer of the insurance company in this case, filed June 13, 1912, it denied that the damages to the vessel amounted to a total loss, but it admitted its liability under the policies for its proportion of general average and salvage charges accruing from the preservation of the vessel and cargo. In its amended answer, filed March 31, 1914, it repeated its admission of liability for general average and salvage charges, with the allegation that an adjustment had since been made of such charges, including expenses, and it had paid the appellee its proportion of such charges, and had been discharged from all liability for general average and salvage losses under said policies. The defense that the vessel was not seaworthy was as much a defense to a liability for general average and salvage losses as it was to a liability for a total or constructive loss. If the vessel was unseaworthy, the policies were void, and no liability was chargeable upon the insurance company. Arnould on Marine Insurance, par. 688.

We must assume, therefore, that when appellant filed its original answer it had no information upon which to base the defense that the vessel was not seaworthy when it sailed on the voyage on October 2, 1911, or, having such information, it waived the defense. When it filed its amended answer on March 31, 1914, more than two years and five months after the disaster, it set up for the first time the defense that all losses and damages suffered by the vessel on the occasion mentioned were caused and occasioned by the unseaworthiness of the vessel, and, specifying the particulars in which the vessel was not seaworthy, it alleged that the vessel was leaky and her pumps not in working order, so that the same could be used to keep the vessel free from water which entered her hull through said leaky condition, and that by reason thereof said vessel commenced to leak and became water-logged in fair weather immediately after starting upon her voyage.

This last allegation is not supported by the evidence. A vessel is wa-

ter-logged when she becomes heavy and unmanageable on account of the leakage of water into the hold. Standard Dictionary, defining the word "water-logged." The Nottingham did not become heavy and unmanageable until October 8th, when she had been six days out, the last four days of which had been heavy weather, and during this time her deck load of lumber, which had been shifted to port by an unusually heavy lurch to port on October 4th, had caused her to take water freely. It was in this situation that the vessel was struck by a heavy gale from the northwest on October 8th. The gale came so suddenly that it carried away one of the boats hanging in the davits, lashed with double lashing. The force of the wind was at that time 100 miles an hour. She threw herself on her beam ends, and, taking a heavy lurch, again shifted her deck load, and then she did not answer her helm. She went over so much that the water came up in the donkey room and put out the fire, and they were unable to keep up steam. The vessel continued to fill, and on the morning of the next day the deck lashings parted, the deck load took a slide to port and up against the rigging, carrying away three masts and the chain plates. The water came in through the holes caused by the tearing out of the chain plates. When the deck load went overboard, it carried away the connections between the donkey boiler and the fresh water tanks, and all the fresh water was lost. Then the donkey engine was operated on salt water, and the vessel was nearly pumped out when a second gale from the southeast struck her and the vessel commenced to fill. The force of the wind was then about 50 miles an hour. The vessel had been water-logged since the day before, but this was not in fair weather and it was not immediately after starting upon the voyage; it was after the deck load of the vessel had shifted, and after a heavy wind had been blowing for four days, which rose to gales from different points of the compass.

With respect to the allegation that the vessel was leaky and the pumps not in working order, it appears that the failure of the steam pump to work was only temporary, and the appellant knew all the facts about that condition of the vessel from the statement of the master in his report of the wreck soon after coming ashore on October 14th. But it appears from the record that on July 31, 1913, while S. B. Gibbs, agent and surveyor for the San Francisco Board of Marine Underwriters, was giving his testimony for the defendant, a photograph showing a seam in the vessel under the stern post on the port side was offered in evidence. Counsel for plaintiff asked if the photograph was offered for the purpose of establishing the claim that the vessel was unseaworthy. Counsel for the defendant thereupon gave notice that, if the testimony produced developed an unseaworthiness of the vessel on sailing, he should ask leave of the court to amend the pleadings to conform to the proof. At this same examination the witness gave evidence concerning a crack in the flange of the water-closet waste pipe. Through both the seam and the flange, the witness testified, water would leak into the vessel; but there was no further development of unseaworthiness in the vessel by the testimony. There is in the record the copy of a night telegram from Albert Crowe, the marine surveyor

for the defendant, to the secretary of the Board of Marine Under-writers in San Francisco, dated December 21, 1911, referring to the specifications for the proposed repair of the vessel, in which it is stated that:

"Stern post seam on twenty-foot mark space six inches long no oakum whatever."

It is not stated that it was an open seam through which water would leak into the hold of the vessel. In the examination of this seam made for the defendant by Mr. Gibbs, the marine surveyor, on May 2, 1912, or six months after the disaster to which he referred in his testimony, he stated that it was three-sixteenths of an inch in width and one foot long, the draft of the vessel was 20 feet 6 inches, and the seam was at the 20-foot 4-inch mark, or 2 inches below water. The witness tes-tified that the crack in the flange of the water-closet pipe was about one-sixteenth of an inch, and was about 1½ feet under water. The witness was unable to say whether the crack extended around the flange, and he could not say whether the supposed leaks at these two points would be sufficient to water-log the vessel.

But, whatever may have been the character of these two small cracks, the seam was known to the appellant as early as December 21, 1911, and the crack in the flange to the water-closet pipe as early as May 2, 1912, and there was no concealment of either on the part of the ap-pellee, and yet the defense that the vessel was unseaworthy was not in-terposed until March 31, 1914. In the meantime, acting upon a mutual understanding to save as much of the vessel as possible for the in-surer, as well as for the insured, the appellee had incurred and paid its proportion of the salvage and general average charges and the ex-pense attending the adjustment of the same.

[3] There is a rule of marine law upon this subject that any forfei-ture of a policy caused by a violation of its terms will be deemed waived by the insurer if, after knowledge of the facts constituting such forfeiture, he treats the policy as obligatory. Barber's Principles of Insurance, p. 96; Titus v. Glen Falls Ins. Co., 81 N. Y. 419. In the latter case the court said:

"If, in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is as matter of law waived; and it is now settled in this court, after some difference of opinion, that such a waiver need not be based upon any new agreement or an estoppel."

But, aside from this rule, we are of the opinion that the appellee should prevail on this issue. We prefer to consider the admissions of the appellant and its delay in setting up the defense of unseaworthiness as arising from the fact that the evidence of rough and heavy seas from October 8th to October 13th furnished a reasonable and suffi-cient explanation of the leaky condition of the vessel at that time, and that appellant was unable to obtain satisfactory evidence that the vessel was in fact unseaworthy. This is what we find after a careful reading of the testimony, and our conclusion is very clear that the testimony shows that the damage to the vessel was not caused by the unseaworthy

condition of the vessel, but by perils of the sea against which appellant undertook to insure the appellee.

[4] 2. With respect to the claim of appellee that the schooner was a total loss: The rule is that the burden of proving a loss for a cause and to an amount for which the insurers are liable is upon the assured. Heebner v. Eagle Ins. Co., 10 Gray (Mass.) 131, 69 Am. Dec. 308, 314; Soelberg v. Western Assur. Co., 119 Fed. 23, 31, 55 C. C. A. 601.

[5] The evidence in support of the claim in this case is the testimony of George F. Thorndyke, the manager of appellee, who testified that the schooner, as she lay in the harbor of Astoria on October 16, 1911, was worth but little or nothing—no more than anywhere from $3,000 to $4,000, that would be speculation, and the testimony of Frank Walker, a marine surveyor acting for the appellee, who testified that he examined the schooner as she lay at anchor at Astoria about the 18th of October, and at that time he considered her value practically nothing.

The appellee cites the case of Insurance Co. v. Fogarty, 19 Wall. 640, 22 L. Ed. 216, as holding that, if the damage is such that the thing insured has no value for the use for which it was intended, and cannot be so repaired as to make it useful for that purpose, except at an expense exceeding its value, it is a total loss under the marine insurance law. The subject insured in that case consisted of the various parts necessary for a complete sugar-packing machine, warranted by the assured free from average unless general. The vessel on which this machine was being transported was driven on the rocks in a violent gale, was filled with water, and finally became a total wreck and was abandoned to the underwriters. A large number of the pieces composing the machine were recovered and tendered to the owner, which he refused to receive, on the ground that the insurance company was liable to him as for a total loss. The insurance company denied its liability. The articles composing the machine were all of iron. About half of them in weight was saved, and the remainder left at the bottom of the sea. *That which was saved was entirely useless as machinery, and was of no value except as old iron.* The question was whether, if no part of the machine was delivered in a condition capable of use, the loss would be a total loss, though more than half the parts had been delivered and were of some value as old iron. The lower court had instructed the jury, among other things:

That "the meaning of the term 'free from particular average,' used in the policy, was that the defendant should be liable only for a total loss of the subject insured"; that "if every piece of the machinery was so damaged by the perils insured against as to be entirely unfit for use on being supplied with its corresponding or connecting pieces, then there was a total loss of the subject insured as machinery, although the material itself might still exist."

### The Supreme Court held that the trial court—

"was right in holding that what was insured was machinery—pieces or parts of a machine—pieces made and shaped to unite at points with other pieces, so as to make a sugar-packing machine. If parts of them were absolutely lost, and every piece recovered had lost its adaptability to be used as part of the

machine, had lost it so entirely that it would cost as much to buy a new piece just like it, as to repair or adapt that one to the purpose, then there was a total loss of the machinery. If no piece recovered was of any use, or could be applied to any use, connected with the machine of which it was a part, without more expense on it than its original cost, then there was no part of the *machinery* saved, however much of rusty iron may have been taken from the wreck."

The Supreme Court said, further, that the Circuit Court—

"went quite as far in behalf of the defendant as the law justified, when it told the jury that the plaintiff could not recover if any piece or portion of the machinery insured arrived at its destination in a condition so perfect that it could have been used with its corresponding or connecting pieces, had they also arrived in good condition."

The case does not quite support the claim of appellee as to the elements of a total loss. The court was dealing with the loss of parts of a machine, where the pieces or parts were so made and united at points with other pieces or parts that the whole constituted a complete operating machine. About half of these parts were absolutely lost; the other half were saved, but no part saved was of any use, or could be applied to any use connected with the machine of which it was a part without more expense on it than the original cost. The result was, no part of the machine was saved, and it became an absolute total loss. In the present case, the vessel was not totally lost; the hull and some parts of the apparel and equipment of the vessel were saved and brought back to the seaport of departure by salvors in a condition capable of being repaired, perhaps not at that port, but at a place some distance therefrom.

There is a manifest difficulty in stating any general rule that would be applicable to all cases, and no such rule appears to have been clearly stated by the courts; but analogous cases afford some light on the subject. In the case of Murray v. Hatch, 6 Mass. 465, the action was upon a policy of insurance upon a ship, her cargo and freight, against *total loss only*. The vessel was cast ashore, but afterward got off and carried into a port where repairs were practicable. The agent of the owner proceeded to strip the vessel, to sell the hull and cargo, and to abandon the voyage. The court, passing upon the question of total loss, said:

"Perhaps, upon the facts found, it is not perfectly clear what was the extent of the injury which the vessel insured had sustained; but if afloat, or if it was practicable to put her afloat, and if she was capable of being repaired at any expense, it was not a total loss within the meaning and intent of the policy relied on in this case. It is stated that the vessel was not worth repairing, and that it would have cost $1,500 to repair her; which proves that the subject-matter of the insurance was not specifically destroyed, and that the voyage was not entirely and inevitably defeated. Whether the injury sustained, and the expenses of salvage, rendered the voyage of no value, and not worth pursuing, is not a question to be considered, where the policy is restricted to the case of a total loss. That case is only proved by showing the destruction of the thing specifically, and in that sense totally."

What constitutes an actual total loss of a vessel insured "against actual total loss only" was considered in the case of Burt v. Brewers' & Maltsters' Ins. Co., 9 Hun, 384, 385. The court said:

"When the ship, in the course of her voyage, and by the agency of the perils insured against, becomes an absolute wreck, when she has been broken

in pieces and dismembered, so that her planks and apparel are scattered on the sea, this is a case of absolute total loss on ship, though the whole or greater part of the fragments may reach the shore as wreck. In such a case, it is quite clear that the ship, *as a ship*, is totally destroyed; the ship has perished, only the wreck remains. * * * Where the liability of the underwriter is expressly restricted to an absolute or actual total loss, there must exist such a state of things as that the subject of insurance is wholly destroyed as that thing, in specie, which was insured, or, at all events, there must be left no spes recuperandi."

This case was affirmed by the New York Court of Appeals substantially upon the opinion of the Supreme Court cited. Burt v. Insurance Co., 78 N. Y. 400.

In the case of Bullard v. Roger Williams Ins. Co., 1 Curt. 148, Fed. Cas. No. 2122, the action was for a total loss on a policy of insurance for a vessel on the voyage described in the policy. The insurance was against a total and constructive total loss and for a partial loss if the damage to the vessel by the perils insured against amounted to 10 per cent. or over. The value of the vessel amounted to $3,000, and was insured for $2,000. On the voyage in question the vessel encountered cross-seas, sprung a leak, and was taken to port. Upon being surveyed, it was found that she could be repaired for $2,000, and that when repaired the vessel would not be worth the cost of repairs. The case was tried before the court and a jury. Mr. Justice Curtis instructed the jury that an abandonment of the vessel to the underwriters was necessary to enable the owner to recover for a constructive total loss, and that no sufficient abandonment had been proved in the case. The question for the jury, then, was whether the loss was an actual total loss or a partial loss amounting to 10 per cent. and over. The court instructed the jury as to what constituted an actual total loss as follows:

"It has been much discussed what constitutes a total loss, when the vessel remains in specie and still retains the form of a vessel, in a place of safety. I shall not trouble you with the different views which have been taken of this question, but I will state the rules which I deem proper for your guidance. It is manifest that the form of a vessel may remain and be in a place of safety, and yet, for all useful purposes, the vessel may have ceased to exist. If she be absolutely incapable of repair, so as to be fitted to encounter the seas, then she has ceased to exist as a vessel, though great part of her materials may remain, and they may still be in the form of a vessel. So, though capable of being repaired and restored to the condition of a sea-going vessel, yet if this can only be done at an expense exceeding the value of the vessel when repaired, it is an expense which no one is bound to incur, and therefore the case is the same as if absolutely irreparable; there being no practical difference, for this purpose, between what cannot be done at all, and what no prudent person would undertake to do. And therefore, if you should find, from the evidence in the case, that the injuries suffered by this brig from perils of the sea were so great that they could not be repaired, so as to make her a seaworthy vessel, except at an expense exceeding her value when repaired, then this was a case of actual total loss, and no abandonment was necessary."

Whether insurance on a vessel against "actual total loss only" covers the case of a *total loss of value,* although the ship remains in the form of a ship, capable of being repaired at some cost, and is not placed by sale or otherwise beyond the power of the insured to procure her arrival, was referred to and doubted, but not decided, by the New York

Court of Appeals, in Carr v. Providence Ins. Co., 109 N. Y. 504, 17 N. E. 369, 370.

We do not deem it necessary to discuss that question as an element in the claim for an actual total loss in this case, for the reason that the insurance against a constructive total loss provided for in the policies under consideration covers a total loss of *value* if it existed; and in our opinion that is where that question is placed by the terms of the policies, and there only is where it should be considered in this case. In view of the authorities cited, and others referred to in the cases cited, we are of the opinion that the total loss of the vessel as a vessel has not been proven. We therefore proceed to consider the terms of the policies providing insurance against a constructive total loss.

3. The first printed paragraph in each of the policies covers a loss, but expressly excludes partial loss and particular average; the following printed clause in the paragraph, "unless amounting to at least ———— per cent. net," being deleted. In paragraph 3 of the policies it is provided that:

"The adventures and perils which this insurance company is contented to bear, and takes upon itself in this policy, they are of the seas * * * and all other losses and misfortunes that shall come to the hurt or damage of the vessel hereby insured, or any part thereof, to which insurers are liable by the rules and customs of insurance in San Francisco, including the rules for adjustment of losses printed on back hereof and the provisions of the Civil Code of California, excepting such losses and misfortunes as are excluded by this policy."

As a constructive total loss is not excluded by the policies, the provisions of the Civil Code of California upon this subject became terms of the policies, except as such terms are excluded by the policies. Chapter 2 of title 11 of the Civil Code of California relates to "Marine Insurance." Section 2703 of that chapter provides that "a total loss may be either actual or constructive." Section 2705 provides that:

"A constructive total loss is one which gives to a person insured a right to abandon, under section two thousand seven hundred and seventeen."

Section 2717 provides:

"A person insured by a contract of marine insurance may abandon the thing insured * * * and recover for a total loss thereof, when the cause of the loss is a peril insured against:

"1. If more than half thereof in value is actually lost, or would have to be expended to recover it from peril;

"2. If it is injured to such an extent as to reduce its value more than one-half;

"3. If the thing insured, being a ship, the contemplated voyage cannot be lawfully performed without incurring an expense to the insured of more than half the value of the thing abandoned, or without incurring a risk which a prudent man would not take under the circumstances."

Section 2744 provides that:

"A marine insurer is liable for a loss falling upon the insured, through a contribution in respect to the thing insured, required to be made by him towards a *general average loss* called for by a peril insured against."

In chapter 3 of title 6 of the Civil Code, relating to "Service Without Employment," section 2079 provides that:

"Any person, other than the master, mate, or a seaman thereof, who rescues a ship * * * from danger, is entitled to a reasonable compensation there-

for, to be paid out of the property saved. He has a lien for such claim, which is regulated by the title on liens; * * * the actual costs at the time of the services rendered by one such vessel to another, when in distress, are payable through a general average contribution on the property saved."

[11] On the margin of the policies there was printed a further provision for insurance covering the contingency of a collision of the insured vessel with another vessel and the liability of the insured to pay for the injury to such other vessel. This special contract is known as the "collision" clause, or, as it is better named, the "running down" clause. Gow on Marine Insurance, p. 244.

The policies, by their own terms and by reference to provisions of the Civil Code of California, insured the appellee against actual total loss, constructive total loss, general average, salvage charges, and claims under the three-fourths running down clause. We have determined, as before stated, that an actual total loss was not established by the proof, and, as a partial loss is excluded by the policies and the three-fourths running down clause is not involved, we are limited to the inquiry as to the elements of a constructive total loss and whether, under the policies in suit, such a loss includes general average and salvage charges.

The vessel was valued in the policies at $45,000. The indisputable testimony is that the actual value of the vessel did not exceed $30,000, and she was insured for that amount. It appears that the vessel had been previously insured for $25,000 upon a valuation in the policy fixed by the underwriters at $55,000. Upon the appellee increasing the insurance to $30,000, the underwriters reduced the valuation in the policies to $45,000. The relation of the amount insured to the value fixed in the policy determines the percentage of the underwriters' contribution to a constructive total loss; the underwriter accordingly fixes the insurance value of the vessel in the policy, which the insured must accept if he wishes to obtain the insurance.

We will now consider the rules under which the amount of damage to the vessel is to be determined. In paragraph 8 of the policies it is provided:

"It is agreed that one-third shall be deducted from the cost of all repairs of injuries and losses on the vessel by the perils insured against (except on anchors, copper and calking under the copper), as a commutation for the average difference between new and old; the remains of all articles replaced being considered as salvage, and their proceeds deducted from the gross loss."

In paragraph 9 of the policies it is provided:

"That the insured shall not have the right to abandon the vessel unless the amount which this company would be liable to pay under an adjustment, as of partial loss for labor and materials (exclusive of salvage or general average expenses and the cost of funds), shall exceed half the amount hereby insured."

Turning to section 2717 of the Civil Code of California, we find that the insured may, under that statute, abandon the thing insured and recover for a total loss:

(1) "If more than half thereof in value is actually lost, or would have to be expended to recover it from peril;" (2) "if it is injured to such an extent as to reduce its value more than one-half;" or (3) "if the * * * contemplated voyage cannot be lawfully performed without incurring an expense to

the insured of more than half the value of the thing abandoned, or without incurring a risk which a prudent man would not take under the circumstances."

The measure of indemnity provided in paragraph 8 of the policies—that is to say, two-thirds of new for old in cost of repairs—is substantially the same as section 2746 of the Civil Code. But there is no provision in the Code requiring an adjustment as of partial loss, nor is there an exclusion of salvage or general average expenses, nor is it provided that the insured shall not have the right to abandon unless the liability of the company to pay, as thus determined, shall exceed half the amount insured. What, then, becomes of the provisions of the Civil Code with respect to the right of abandonment? Are they to be deemed as terms of the contract of insurance, or have they been superseded or modified by these provisions of the policies?

The fact that some of the provisions of the Code have been incorporated into the policies, while others have not and in their place other and different provisions have been inserted, appears to justify the latter conclusion. And we are of the opinion that they have been so superseded or modified in this particular by virtue of that clause of paragraph 3 which, after providing specifically for the risks which the appellant assumes, includes the liability provided by the Civil Code of California, *"excepting such losses and misfortunes as are excluded by this policy."*

In estimating for a constructive total loss, a loss that the insurance company would be liable to pay under the Civil Code, but not to be computed under paragraph 9 of the policies, as an adjustment of partial loss for labor and materials, would be a loss excluded by the clause in paragraph 3 "excepting such losses and misfortunes as are excluded by this policy." So, too, with respect to a computation for a constructive total loss which would include salvage or general average expenses. If this should be permissible under the Code, it must nevertheless be excluded from the computation under paragraph 9 of the policies. In other words, there might be a constructive total loss under the provisions of the Civil Code, but not under paragraph 9 of the policies. In such case, the latter must prevail, because it would be a loss excluded by paragraph 3 of the policies.

A further provision of the policies remains to be considered. On the margin of the policies there is a typewritten clause, as follows:

"This insurance is against total and/or constructive total loss of vessel including general average and/or salvage charges and/or claims under three-fourths (¾) running down clause."

It will be observed that, with the running down clause also printed on the margin of the policies, this character of insurance described in the typewritten clause was fully provided for in the policies before that clause was placed on the margin of the policies. What, then, was the purpose of this clause?

The appellant contends that it was merely definitive of the character of the insurance, and does not initiate or provide any new term in the insurance contract, and was not so intended by the parties. The appellee, on the other hand, contends that it was intended to modify and does modify paragraph 9 of the policies; that it should be construed

as doing away with the clause in that paragraph excluding salvage and general average expenses in computing the amount of damages which, if amounting to half the amount insured, entitles the insured to recover for a constructive total loss; that, if that was not its purpose, it has no meaning and is without significance; that otherwise the clause is inconsistent with the provisions of paragraph 9, and, being in writing, supersedes the printed paragraph; that it was written in by the insurance company, and, if ambiguous and doubtful in its meaning, the court must lean in favor of the insured in its construction.

[6] Assuming that the meaning of the clause is ambiguous and doubtful, there is no question but that the appellee states the duty of the court correctly. "If there be any inconsistency between the written provision of the policy and the printed portions thereof, the written language must prevail." Hagan v. Scottish Union & National Ins. Co. (D. C.) 98 Fed. 129, 130; s. c., 186 U. S. 423, 22 Sup. Ct. 862, 46 L. Ed. 1229.

[7] The other rule is equally well established: That where the insurer has used terms in the policy that leave it a matter of doubt as to the true construction to be given the language, the court should lean against the construction which would limit the liability of the company. National Bank v. Insurance Co., 95 U. S. 673, 678; London Assurance v. Companhia De Moagens, 167 U. S. 149, 159, 17 Sup. Ct. 785, 42 L. Ed. 113; Canton Ins. Office v. Woodside, 90 Fed. 301, 305, 33 C. C. A. 63; Thames & Mersey v. Pacific Creosoting Co., 223 Fed. 561, 567, 139 C. C. A. 101. In other words, if the policy will fairly admit of two constructions, the one should be adopted which will indemnify the insured. Grace v. American Central Ins. Co., 109 U. S. 278, 282, 3 Sup. Ct. 207, 27 L. Ed. 392; Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 666, 8 Sup. Ct. 1360, 32 L. Ed. 308; Burkheiser v. Mutual Accid. Ass'n, 61 Fed. 816, 818, 10 C. C. A. 94, 26 L. R. A. 112.

[8] But does the clause in question fairly admit of two constructions? It says, "This insurance" (referring to the insurance mentioned in the policies) "is against," and then it proceeds to enumerate the risks provided for in the policies, and stops there. It does not refer to paragraph 9 of the policies, either expressly or impliedly, nor does it refer to the right of abandonment or to the method of computing a constructive total loss under the policies. It does not say, expressly or impliedly, that the provision of paragraph 9 excluding general average and salvage charges and expenses from the computation shall be disregarded. It has a possible useful meaning in the brief summary it makes of the risks covered by the policies—a meaning doubtless of substantial value to the insured in his other and subsequent dealings with the business of the vessel—and there is no apparent inconsistency in the insurance enumerated in the clause against general average and salvage charges and expenses and the exclusion of such charges from the elements of a constructive total loss, as provided in paragraph 9 of the policies. If the insured is indemnified by the insurance company for its proportion of such losses, as in this case, there is no apparent inconsistency in excluding such proportion of the loss from the computation of a constructive total loss. How, then, can the court say

that the marginal clause is inconsistent with paragraph 9 of the policies, or that it was intended to so modify that paragraph, when it is not so written in the policies? The provisions of the contract are clearly stated, and "we know of no sound principle or rule applicable to the construction of contracts that will enable a court of law to say that they intended something else." Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 674, 22 Sup. Ct. 240, 46 L. Ed. 366.

As before stated, the amount insured by the policies was $30,000, and that was the actual value of the vessel. To entitle the insured to abandon the vessel as and for a constructive total loss, it devolved upon the insured to show by competent proof that the appellant was liable to pay, under an adjustment as for partial loss for labor and materials, expenses amounting to a sum in excess of $15,000. This we think has not been done. The computation most favorable to the appellee that we can make from the evidence as to the appellant's liability under paragraphs 8 and 9 of the policies is as follows:

Total of the particular average as shown by the evidence......... $20,975.25
Deduct one-third off new for old, under paragraph 8 of the policies    6,991.75
                                                                    _____
    Leaving net adjustment................................... $13,983.50
Loss of consumable stores....................................   2,370.14
Add the proportion of cost of bottom painting chargeable to particular average .......................................................     201.89
                                                                    _____
    Total ................................................... $16,555.53
                                                                    _____

Insurance, $30,000 on actual value.
Policy valuation of $45,000.
Appellant's liability would be 30000/45000, or 2/3 of $16,555.53,
    making a total liability of.................................... $11,037.02

This total liability of $11,037.02 is $3,962.98 less than the amount required to give the appellee the right to abandon as and for a constructive total loss. The general average adjustment stated by the adjusters was the sum of $8,789.01. Deducting the sum of $3,000 paid in settlement of the salvage claims leaves $5,789.01 as the general average expenses. The appellee asks that the whole of this sum be added to the appellant's liability as the cost of repairs. This we cannot do, because we do not find that this sum was in fact expended for *repairs*. It was stated by the adjusters employed by the appellee as *general average expenses,* and, upon that adjustment, the appellee collected from the appellant the net sum of $3,539.38, or, including interest and a disbursing commission due the appellant, amounting to $218.93, the total sum of $3,758.31, as the appellant's proportion of the general average charges. We do not think that this sum already paid by the appellant as a general average loss can again be added here as a loss to be computed and included as an element of a constructive total loss: First, because, although an original general average loss, it has been paid by the appellant and is no longer a loss to the appellee; and, second, because it is excluded by paragraph 9 of the policies. If the balance of $2,030.70 be allowed, although excluded by paragraph 9 of the policies, the liability of the appellant would still be $1,932.28 less than the amount required to give the appellee the right to abandon as and for

a constructive total loss. In other words, we do not find in the record evidence that will justify us in finding that there was a constructive total loss under the terms of the policies.

[9] 4. But the appellee contends, further, for the right of abandonment under what is termed the "high probability rule." This rule is stated by Chancellor Kent in the following language:

"The right of abandonment does not depend upon the certainty, but upon the high probability, of a total loss, either of the property, or voyage, or both. The insured is to act, not upon certainties, but upon probabilities; and if the facts present a case of extreme hazard, and of probable expense, exceeding half the value of the ship, the insured may abandon, though it should happen that she was afterwards recovered at a less expense." 3 Kent's Comm. 321.

This rule was applied in Bradlie v. Md. Ins. Co., 12 Pet. 397, 9 L. Ed. 1123; Orient Ins. Co. v. Adams, 123 U. S. 67, 75, 8 Sup. Ct. 68, 31 L. Ed. 63; Royal Exch. Assur. v. Graham, etc., Co., 166 Fed. 32, 92 C. C. A. 66. But in these cases the policies did not contain, as the present policies do, the provision fixing the right to abandon upon certain specified terms. If paragraph 9 of the policies means what it says, there is no room for the "high probability rule." As said by Mr. Justice Matthews, in Wallace v. Thames & Mersey Ins. Co. (C. C.) 22 Fed. 66, 70:

"The right of abandonment is made to depend upon the result, and not upon a calculation of probabilities."

In Searles v. Western Assur. Co., 88 Miss. 260, 40 South. 866, 869, 117 Am. St. Rep. 741, the action was to recover on a policy of insurance upon a vessel for a constructive total loss. The vessel was valued at $3,000, and was insured for $2,000. The policy provided that there should be no abandonment as for a constructive total loss in consequence of any loss or damage unless the cost of necessary repair required solely by the disaster, exclusive of cost of raising or rescuing the vessel and taking her to the dock and any other general average charges, be equivalent to 75 per cent. of the agreed value as specified in the contract of insurance. The vessel was sunk and abandoned, but it appeared that it would have cost less than 25 per cent. of the agreed value to raise and repair her. The trial court gave the jury a peremptory instruction in favor of the defendant, which was sustained by the Supreme Court of the state. The latter court, discussing the question of abandonment, said:

"The clause in the insurance policy which enables him to make an abandonment in a proper case, and determining the conditions under which the abandonment may be made, is just as much a part of the insurance policy as any other stipulation or condition contained in the policy."

In the case of Soelberg v. Western Assur. Co., 119 Fed. 23, 30 (55 C. C. A. 601), this court in dealing with this question said:

"Parties must be governed by the terms of the contract which they have entered into, and are not bound by the rules which apply only to other and different kinds of contracts."

[10] But, aside from the provisions of paragraph 9 of the policies, it does not appear that the appellee is in a position to avail itself of the rule if it should be deemed applicable to this case. The rule has re-

lation to the high probability of a total loss of the property existing at the time the notice of abandonment is given, and not to the time the vessel was abandoned by the officers and crew on October 13th. The high probability of a total loss here referred to is one that arises in a case of extreme hazard, where the probable expense for recovery at the time of the extreme hazard exceeds half the value of the ship. The vessel was rescued and towed into Astoria on Sunday, October 15th. The written notice of abandonment was given on Monday, October 16th. It is true that there is some testimony tending to show a verbal abandonment on Saturday, October 14th; but the testimony is conflicting, and, without going into detail concerning its character, we are of the opinion that it does not satisfactorily establish the fact of an abandonment at that time. The right of the appellee to abandon the vessel, if such right existed, must therefore be determined by the situation of the vessel and the conditions existing on Monday, October 16th, when the written notice of abandonment was given to the agent of appellant. At that time the vessel was afloat and riding safely at anchor in the harbor of Astoria, and its situation and condition had no other high probability than that disclosed by the evidence, which we have already considered and found insufficient to establish a constructive total loss.

Under the terms of the policies in this case, as agreed to by the parties, and the evidence in the record, we do not think a constructive total loss has been established. We conclude, therefore, that the vessel was seaworthy when she set out on her voyage; that she did not become a total loss, and, under the terms of the policies of insurance, did not become a constructive total loss.

It follows that the decree must be reversed, and the court below directed to dismiss the libel, with costs; and it is so ordered.

RUDKIN, District Judge (dissenting). The court below found that the insured vessel was seaworthy and that there was a constructive total loss under the terms of the policy. I am not prepared to say that these findings are without adequate support in the testimony, and therefore dissent.