FERNANDO BARRERAS, Plaintiff and Appellee, *v.* MIGUEL SANTANA and UNITED BENEFIT FIRE INSURANCE COMPANY, Defendants and the latter Appellant.

No. 520.    Decided February 8, 1963.

*José Trías Monge, R. H. Francis,* and *Horacio R. Subirá* for appellant. *Rafael A. González* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

Mr. Justice Rigau delivered the opinion of the Court.

There is no controversy on the facts. A horse owned by codefendant Miguel Santana caused damages to another horse owned by plaintiff Fernando Barreras through the negligence of the employees of codefendant Santana while both horses were being trained in "El Comandante" racetrack. The injuries sustained by plaintiff's horse were of such nature that it was necessary to kill the animal. Both owners of the horses were at the time of the occurrence members of the Racing Association of Puerto Rico. Codefendant United Benefit Fire Insurance Company, of Omaha, Nebraska, was under a single policy the insurer of the Racing Association and of its members.

Plaintiff obtained judgment in the Superior Court against Santana and the insurance company for $5,000, plus costs and $500 for attorney's fees. The company appeals to this Court alleging that that hazard was excluded from the express terms of the policy and that, therefore, the judgment against it is improper.

The policy, which is drawn up in English, was issued to "Asociación Hípica de Puerto Rico and/or Individual Members." According to its terms, the insurer is bound to the following: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined."

In referring to the hazards covered thereunder, the policy defines them as "The ownership . . . or use of . . private and race horses (per horse)." In its exclusion clauses the policy states that it is not applicable "to injury or destruction of (1) property owned or occupied by or rented to the insured, or (2) . . . property used by the insured . . ."

The insurance company's theory is the following: The policy covers damages to property, but it does not cover damages to the insured's property; since plaintiff Barreras is an insured, the policy does not therefore cover damages to his property.

Plaintiff replies: The weakness of defendant's reasoning consists in that plaintiff is not claiming damages to the company under the policy existing between him (the plaintiff) and the company. Within that contractual relationship he is the insured and he could not, under the terms of the policy, make claim to the company for the damages sustained by his property, but the company would be liable for the damages which he (plaintiff and insured) would cause to the property of others. But the fact is that plaintiff is claiming damages caused to him by a person who is also an insured of the company and for whom the company assumed liability. In other words, plaintiff is claiming under the terms of the policy existing between the company and defendant and not under the terms of the policy between plaintiff and the company.

Thus faced with two distinctive and necessary constructions of the insurance contract in question, and there being

no solution in the text thereof for the controversy posed, we must necessarily construe the same. As stated by Couch, rarely is an insurance case decided without a construction of some provision of the policy. 1 COUCH, Insurance 2d, 637.

■ It is a general rule of contract that the interpretation of obscure stipulations in the text of a contract must not favor the party occasioning the obscurity. Section 1240 of the Civil Code, 31 L.P.R.A. § 3478; *Torres* v. *Porto Rico Racing Corporation*, 40 P.R.R. 423, 425 (1930). This rule has greater effectiveness than ordinarily in the field of insurance. *Aparicio* v. *Teachers' Association*, 73 P.R.R. 549, 554 (1952) ; *Susoni* v. *Pacific Woodmen Life Ass'n*, 51 P.R.R. 521, 525 (1937) ; *Mutual Life Insurance Co.* v. *Hurni Packing Co.*, 263 U.S. 167, 174 (1923) ; *Thompson* v. *Phenix Insurance Co.*, 136 U.S. 287, 297 (1889) ; *First National Bank* v. *Hartford Fire Insurance Co.*, 95 U.S. 674, 678–79 (1877) ; *Mass. Protective Ass'n* v. *Bayersdorfer*, 105 F.2d 595, 597 (1939) ; *Heyward* v. *American Casualty Co.*, 129 F. Supp. 4, 8 (1955) ; *Farley* v. *American Auto Ins. Co.*, 72 S.E.2d 520, 521 (1952) ; *Aetna Life Ins. Co.* v. *Padgett*, 176 S.E. 702, 703 (1934).

▮■ Richards states that no rule of interpretation of an insurance contract is more firmly embedded than that which declares that where the contract is susceptible of two interpretations, it should be most strongly construed in favor of the insured, 3 RICHARDS, Insurance 1314 (5th ed. 1952), and authorities therein cited. A similar view is shared by Vance, who points out that almost without exception the courts uphold such rule of construction in favor of the insured, and that there are so many decisions which have ratified the rule that it would be almost impossible to cite them all. VANCE, Insurance 809 (3d ed. 1951). It will suffice to examine the annotations on the matter which appear in the works cited in the course of this opinion to realize that this is true and that it would be idle to cite such a large

number of cases. In this connection, see, also, 1 COUCH, Insurance 2d, 658 and 661–62.

■ The afore-mentioned general rule that the ambiguity in the wording of contracts should not favor the party occasioning it operates, as stated, more strongly in the case of insurance contracts because they are contracts of adhesion. They are so considered in civil as well as in Anglo-Saxon common law. In civil law, PUIG BRUTAU points it out expressly and says that the insurance contract "is a contract of adhesion . . . in the sense . . . that the insured can not alter with the normal play of the previous negotiation the conditions embodied in this class of contracts with a general character. For this reason, the case law has declared that since a contract of insurance is practically an adhesion contract, in case of doubt as to the meaning of the general clauses of a policy drafted by the insurance company there should be admitted the interpretation most favorable to the insured." II-II *Fundamentos de Derecho Civil* 486 (1956 ed.). CASTÁN mentions them as "very frequent examples of adhesion contracts." III *Derecho Civil Español, Común y Foral* 332 (8th ed. 1954). See, also, Judgments of December 13, 1934 and February 27 and March 6, 1942 of the Supreme Court of Spain.

In common law, VANCE, *op. cit.* at 243, expresses it with clarity and realism:

"The rigor with which the courts apply to insurance policies the rule that the terms of a contract are to be considered strongly against the party choosing them can better be understood when it is remembered that a policy of insurance is a contract of 'adhesion'. That is to say, the terms of the contract do not result from mutual negotiation and concessions of the parties and so do not truly express an agreement at which they have arrived. Rather most of the terms are fixed in accordance with a form prescribed by the insurer, or even by statute, to which the insured may 'adhere' if he chooses, but which he cannot change. To hold the insured strictly to terms in the choosing

of which he had no part, and the meaning of which he often cannot understand, would often work gross injustice which the courts are loth to inflict."

See, also, PATTERSON, "*The Delivery of a Life Insurance Policy*," 33 Harv. L. Rev. 198, 222 (1919) ; the Comment in 35 Yale L. J. 203, 206 (1926) ; EHRENZWEIG, "*Adhesion Contracts in the Conflict of Laws*," 53 Colum.L.Rev. 1072, 1082 (1953).

■ Insurance contracts are also considered in Puerto Rico as adhesion contracts (*Maryland Casualty Co.* v. *San Juan Racing Ass'n,* 83 P.R.R. 538 (1961) ), in which in several aspects of the law a summary of both juridical systems above-mentioned is being elaborated.[1]

---

[1] Those interested in the matter would do well to see CASTÁN, "*En Torno al Derecho Civil de Puerto Rico*," 26 *Rev. Jur. U.P.R.* 7 (1956) ; HOOD, "*Louisiana and the Civil Law: A Crossroad in Louisiana History*," 22 La. L. Rev. 709 (1962) ; TATE, "*Techniques of Judicial Interpretation in Louisiana*," 22 La. L. Rev. 727 (1962) ; ORTIZ, "*El Derecho Como Vehículo de Expresión de Nuestra Cultura*," 5 *Rev. C. Abo. P.R.* 133 (1940) ; RODRÍGUEZ RAMOS, "*Reexamen del Precedente Judicial en Puerto Rico*," 15 *Rev. C. Abo. P.R.* 7 (1954) ; and POUND, "*Comparative Law and History as Bases for Chinese Law*," 61 Harv. L. Rev. 749 (1948), "When therefore, I urge that, instead of exact imitation or detailed importation of the law of any country of today, courts and jurists make of the codes a Chinese Law, developed as such by Chinese jurists, and interpreted and applied by Chinese judges as so developed, I do not mean that China is to recede from the stand taken when the codes were framed and adopted and make a new start on the basis of her historical institutions, but that interpretation and application of her codes are not to be blindly borrowed from, even if much influenced by, the interpretation and application of modern codes elsewhere. It is to be remembered that they are Chinese codes, to be applied to the Chinese people, to govern Chinese life. Moreover, a modern system of law is made up not only of authoritative legal precepts and an authoritative technique, but also of authoritative, received ideals, that is, received pictures of the society in which the system of law obtains, in the light of which starting points for legal reasoning are chosen, precepts are interpreted, standards are applied, and judicial discretion is exercised." *Ibid.* p. 757 *in fine.* For historical notes on our law, *see* MUÑOZ MORALES, "*Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*" (1947) ; MUÑOZ MORALES, "*Compendio de Legislación Puertorriqueña y sus Precedentes*" (1948) ; RODRÍGUEZ RAMOS, "*Breve Historia de los Códigos Puertorriqueños*," 19 *Rev. Jur. U.P.R.* 233 (1950).

■ In the light of the existing law on this situation, let us examine the contract under consideration. It was issued to the "Asociación Hípica de Puerto Rico *and/or its Individual Members*" (italics ours). The result of using in that combined form the copulative conjunction "and" and the disjunctive conjunction "or" is, as a matter of fact, the creation of three policies; namely, the insureds are (1) The Asociación as such, (2) the Asociación and its members, and (3) the members of the Asociación. *Bobrow* v. *United States Casualty Co.*, 246 N.Y. Supp. 363, 366 *in fine* (1930); *Schaffer* v. *City Bank Farmers' Trust Co.*, 267 N.Y. Supp. 551, 554 (1933); and Annotation in 118 A.L.R. 1367, 1369. A fortiori, if the effect of that grammatical formula were to create doubt as to its interpretation, then such doubt would be resolved in favor of the insured according to the afore-mentioned tests on the matter.

■■ The purpose of the policy is to provide protection to the insured. VANCE, *op. cit.* at 258. That is why the exclusion clauses are restrictively construed. *Matteson et al.*

In an address delivered in the Bar Association of Puerto Rico in 1948, Dean Rodríguez Ramos pointed out the necessity for reformulating our law instead of making mere compilations as had been done for several decades. 18 *Rev. Jur. U.P.R.* 22 (1948). The Legislative Assembly has to its credit an impressive number of laws whereby it has reformulated important aspects of our law. Examples of these are: Judiciary Act (1952), 4 L.P.R.A. § 1 *et seq.;* The Factors' Lien Act (1954), 10 L.P.R.A. § 551 *et seq.;* Uniform Trust Receipt Act (1954), 10 L.P.R.A. § 611 *et seq.,* Income Tax Act (1954), 13 L.P.R.A. § 3001 *et seq.;* Notarial Law (1956), 4 L.P.R.A. § 1001 *et seq.;* General Corporation Law (1956), 14 L.P.R.A. § 1101 *et seq.;* Insurance Code (1957), 26 L.P.R.A. § 101 *et seq.;* Labor Relations Act (1945), 29 L.P.R.A. § 61 *et seq.;* Horizontal Property Act (1958), 31 L.P.R.A. § 1291 *et seq.;* Vehicle and Traffic Law (1960), 9 L.P.R.A. § 301 *et seq.;* Minimum Wage Act (1956), 29 L.P.R.A. § 245 *et seq.;* Municipal Law (1960), 21 L.P.R.A. § 1101 *et seq.;* Public Service Act (1962), 27 L.P.R.A. § 1001 *et seq.*

Also as part of this reformulation of the Puerto Rican Law, mention should be made of the Rules of Civil Procedure (1958) adopted by the Supreme Court and transmitted to the Legislative Assembly, pursuant to § 6, Art. V of the Constitution; the new Rules of Criminal Procedure adopted by the Supreme Court but which are not in force as yet; and the new Rules of Evidence which are under the consideration of the Court.

222

v. *Johnson et al.*, 11 Automobile Cases 2d 1229, 1230, Wis. Supreme Ct. (1957). The doubts shall be resolved so as to accomplish the purpose of the policy, *Equitable Life Assur. Soc. of United States* v. *Adams*, 83 S.W.2d 461, 464 (1935) ; *Locomotive Engineers M.L. & A. Ins. Asso.* v. *Vandergriff*, 91 S.W.2d 271, 273 (1936), and nice interpretations are not to be favored in order to avoid liability, *Carl Ingalls Inc.* v. *Hartford Fire Ins. Co.*, 31 P.2d 414, 416 (1934) ; [2] instead, it is the duty to take the words of an insurance policy as they are found in it, and as persons with usual and ordinary understanding would construe them when buying the policy, *Equitable Life Assur. Soc. of United States, etc., supra,* p. 464; *Mutual Life Ins. Co. of New York* v. *Smith*, 79 S.W.2d 28, 32 (1935) ; *Jefferson Standard Life Ins. Co.* v. *Hurt*, 72 S.W.2d 20, 23 (1934) ; 13 APPLEMAN, Insurance Law and Practice 27–28. As pointed out by plaintiff, the Asociación, as such, would hardly cause the damages against which its members sought to protect themselves. It ought to be clear that the policy was purchased to protect the horse owners members of the Asociación against the damages which these beasts could cause. That relationship is implied in the act of purchase of the policy. It has been held that what is implied in the insurance contract is as much a part of the contract as though written therein. *Schott* v. *Continental Auto Ins. Underwriters*, 31 S.W.2d 7, 13 (1930).

■ Furthermore, assuming that there is a conflict between the clauses in controversy, the exclusion clause appears in the printed portion of the contract, while the portion which includes plaintiff, as insured as *individual member* of the Asociación ("and/or individual members") is typewritten in the contract and was drafted especially for this policy. Those portions especially drafted in the policies prevail over

---

[2] "A risk fairly within contemplation is not to be avoided by any nice distinction or artificial refinement in the use of words." *Carl Ingalls Inc., etc. supra,* p. 416.

the printed clauses whenever they are inconsistent. The reason is that as to those portions especially written there has been greater assent or meeting of the minds between the contracting parties than as to the printed portions of the contract. *Hagan* v. *Scottish Insurance Company*, 186 U.S. 423, 428 (1902) ; *Thomas* v. *Taggart*, 209 U.S. 385, 389 (1908) ; *Fireman's Fund Ins. Co.* v. *Globe Navigation Co. et al., The Nottingham*, 236 Fed. 618, 633 (1916) ; COUCH, *op. cit supra* at 772–73 and 775.

For the reasons stated, we believe that plaintiff's theory above stated is the correct one. Codefendant is not liable to codefendant Santana, under the terms of its policy with him, for the damages which his horses may sustain since that hazard is excluded from the policy, but it is liable for the damages which the horses of its insured Santana may cause another person, and that other person in this case is the plaintiff.

The judgment rendered in this case by the Superior Court, San Juan Part, on May 5, 1961, will be affirmed.